decision and journal entry
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellants, Richard J. Bennett and Rose M. Merendino, appeal the trial court's decision, granting summary judgment in favor of appellees, Roadway Express, Inc., John M. Glenn, and Debbie Wears. We affirm.
 I.
In 1997 and 1998, Richard Bennett was deputy general counsel for Roadway Express, Inc. ("Roadway") and worked in Roadway's law department. John Glenn was then general counsel, vice president, and secretary of Roadway. Although he was not a member of the law department, Glenn oversaw the daily operations of the law department, and Bennett reported directly to him. Debbie Wears was the litigation case manager in the law department, but was promoted to compliance administrator for the human resources department in the Fall of 1997. Consequently, Bennett began searching for a new case manager for the law department. He contacted Rose Merendino, who had served as a temporary legal secretary at Roadway in 1989 and with whom he had kept in contact, to ascertain whether she was interested in the position. After interviewing Merendino, Bennett offered her the job of case manager in October 1997. Merendino immediately accepted.
According to Merendino, before starting work at Roadway, Merendino was informed by Nancy Sense, a secretary of Roadway's law department, that Wears had been spreading rumors that Bennett and Merendino were having an affair and that was how Merendino had obtained employment at Roadway. According to plaintiffs, both Sense and another Roadway employee, Joyce Hardman, told them that Wears had made those statements. Further, Merendino stated in her deposition that Hardman told her that Glenn had also recounted the statement. Bennett and Merendino, however, never personally heard either Wears or Glenn make the allegedly defamatory statements. Furthermore, Sense and Hardman denied that Glenn and Wears had made those statements, and further, denied ever telling plaintiffs that Glenn and Wears had said plaintiffs were having an affair.
Merendino testified that shortly after she began her job at Roadway, she noticed Glenn looking her up and down and staring at her legs. She testified that he treated her like a "bimbo" and completely disregarded her work. She attributed Glenn's lack of respect to the fact that he thought she was "was just some bimbo sleeping with the boss" to get the job.
Merendino complained to Bennett about Glenn's treatment of her and felt that she was being sexually harassed. Accordingly, in January 1998, Bennett allegedly informed Tom Lopienski, vice-president of human resources, and Bob Chess, director of human resources, that Glenn was mistreating Merendino and was looking at her in an inappropriate manner, which made Merendino uncomfortable. Bennett admitted, however, that he did not say that he believed Glenn's behavior violated Roadway's sexual harassment policy. After these meetings, Glenn allegedly engaged in constant adverse treatment of plaintiffs. Glenn allegedly retaliated by having frequent meetings and assigning Merendino excessive work, which she deemed pointless. Again, in March 1998, Bennett reiterated the same complaints to Lopienski and Chess. Both Lopienski and Chess stated that Bennett never informed them that Merendino was being sexually harassed. Having heard nothing from Lopienski and Chess, Bennett went to speak with Michael Wickham, Roadway's chief executive officer, on April 27, 1998. At that meeting, Bennett intended to tell Wickham about the sexual harassment, but was unsuccessful because Wickham kept redirecting the conversation.
After the meeting with Wickham, Glenn summoned Bennett to his office. According to Bennett, Glenn stated that he knew everything Bennett said to Wickham and insinuated that he was going to use his power to get revenge. Glenn also informed Bennett about his plans for restructuring the law department. Bennett stated that he was emotionally devastated by the conversation. The next day, April 28, 1998, Bennett began a medical leave of absence and sought treatment.
After Bennett went on the leave of absence, Merendino reported the alleged sexual harassment to a Roadway executive, other than Bennett, for the first time.
On May 18, 1998, Bennett returned to work. Glenn, however, prohibited Bennett from working until he obtained the assurance of a physician that he was able to perform the functions of his position. Although Bennett was cleared to return to work by his physician, defendants insisted that he be evaluated by a company-approved psychiatrist before they would allow him to return to work, due to the vagueness of Bennett's physician's letter. Thereafter, Bennett retained counsel, who contacted Glenn and requested time to consult with his client on this issue. Glenn responded by demanding that Bennett inform him by May 27, 1998 at 5:00 p.m. whether he intended to keep the appointment with the psychiatrist. Instead of confirming that Bennett would keep the appointment, Bennett's attorney reiterated his need for time to discuss the matter with his client. Subsequently, Glenn cancelled the appointment that Glenn had made for Bennett to see a psychiatrist. On May 28, 1998, Glenn discharged Merendino, giving the reason of corporate restructuring. On May 29, 1998, Glenn terminated Bennett's employment at Roadway, allegedly due to his performance.
On October 7, 1998, Bennett and Merendino filed a complaint in the Summit County Court of Common Pleas, naming Roadway Express, Inc., John M. Glenn, and Debbie Wears as defendants. They filed a defamation claim against all three defendants and filed claims for intentional infliction of emotional distress, retaliatory discharge pursuant to R.C. 4112.02, and wrongful discharge in violation of public policy against defendants Roadway and Glenn. Merendino brought claims for sexual harassment and sex discrimination under R.C. 4112.02(A) against Roadway and Glenn. Additionally, Bennett filed claims for handicap discrimination and age discrimination against Roadway and Glenn. Merendino and Bennett also sought punitive damages based on defendants' actions.
On June 9, 2000, Bennett and Merendino moved to compel Nancy Sense, a secretary at Roadway, to disclose the content of her communications with Glenn and Roadway's attorney, which were made in preparation for her deposition. Roadway responded in opposition, claiming that those communications were protected under the corporate attorney-client privilege. On August 16, 2000, the trial court denied the motion to compel, finding that those communications were protected by the corporate attorney-client privilege and the work product doctrine.
After extensive discovery, Wears moved for summary judgment on July 11, 2000. The next day, Roadway and Glenn also moved for summary judgment. Subsequently, on July 26, 2000, Merendino and Bennett moved for leave to amend their complaint to include a claim for tortious interference with Bennett's employment contract with Stark County, Ohio, and moved to voluntarily dismiss the age discrimination claim. Plaintiff responded in opposition to defendants' motions for summary judgment on August 2, 2000. In a decision journalized on September 19, 2000, the trial court granted plaintiffs' motion to voluntarily dismiss the age discrimination claim, but denied their motion to amend the complaint to include a tortious interference with an employment contract claim. The trial court also granted summary judgment in favor of all three defendants. This appeal followed.
 II.
Merendino and Bennett assert nine assignments of error. We will address each in due course.
 SUMMARY JUDGMENT
Pursuant to Civ.R. 56(C), summary judgment is proper if:
(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.
Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327. Appellate review of a lower court's entry of summary judgment is de novo, applying the same standard used by the trial court. McKay v. Cutlip (1992),80 Ohio App.3d 487, 491. The party seeking summary judgment initially bears the burden of informing the trial court of the basis for the motion and identifying portions of the record demonstrating an absence of genuine issues of material fact as to the essential elements of the nonmoving party's claims. Dresher v. Burt (1996), 75 Ohio St.3d 280,293. The movant must point to some evidence in the record of the type listed in Civ.R. 56(C) in support of his motion. Id. Once this burden is satisfied, the nonmoving party has the burden, as set forth in Civ.R. 56(E), to offer specific facts showing a genuine issue for trial. Id. The nonmoving party may not rest upon the mere allegations and denials in the pleadings but instead must point to or submit some evidentiary material that shows a genuine dispute over the material facts exists. Henkle v.Henkle (1991), 75 Ohio App.3d 732, 735.
 A. First Assignment of Error
The trial court erred in granting summary judgment on all ofPlaintiffs-Appellants' claims [i]n finding that Plaintiffs had notestablished that Defendants Wears and Glenn published defamatory remarksthat Plaintiffs were having an affair.
In their first assignment of error, Bennett and Merendino contend that the trial court erred in finding that they had not established that Wears and Glenn published defamatory remarks because the only evidence presented on that issue was inadmissible hearsay. They argue that the evidence was not hearsay. We disagree.
To prevail in a defamation case, a plaintiff who is a private person must prove five elements: "(1) a false and defamatory statement; (2) about plaintiff; (3) published without privilege to a third party; (4) with fault of at least negligence on the part of the defendant; and (5) that was either defamatory per se or caused special harm to the plaintiff." Gosden v. Louis (1996), 116 Ohio App.3d 195, 206.
In the case sub judice, the trial court determined that plaintiffs only presented inadmissible hearsay evidence to show publication, and therefore, had failed to establish this element. To support their defamation claim, Bennett and Merendino presented their respective depositions, in which they testified that two Roadway employees, Nancy Sense and Joyce Hardman, informed them that Wears had told them (Sense and Hardman) that plaintiffs were having an affair. Merendino further testified that Hardman told her that Glenn had also told Hardman that plaintiffs were having an affair. Hardman and Sense denied both having heard Wears and Glenn publish the allegedly defamatory statements and having told plaintiffs that Wears and Glenn made those statements.
In Carriker v. Am. Postal Workers Union (Sept. 30, 1993), Montgomery App. No. 13900, unreported, 1993 Ohio App. LEXIS 4733, *50-52, appellant claimed that Bondurant had defamed her by telling others that she was having an affair with the Union's president. Attached to her motion for summary judgment, Bondurant submitted an affidavit denying that she had ever made such a statement. Id. at *50. In response, appellant submitted her deposition, in which she stated that she had been told by several coworkers that Bondurant had made the defamatory statement. Id. Appellant also presented the deposition testimony of John Smith in which he testified that Cliff Woods was told by Karen Barlow that Bondurant made the statement to Barlow. Id. at *50-51. In affirming the trial court's entry of summary judgment against appellant, the Second Appellate District found that this evidence was incompetent as hearsay, and therefore, appellant failed to produce competent evidence creating a genuine issue of material fact as to whether there was publication. Id. at *51-52.
This court recently upheld a trial court's grant of summary judgment under similar circumstances in Lathwell v. Lorain Cty. Jobs for OhioGraduates (May 10, 2000), Lorain App. No. 99CA007303, unreported, at 6-8. In Lathwell, plaintiff offered as support for his defamation claim the affidavit of Joyce Early. Id. at 6-7. Early stated the Rose Minkeiwicz told her that Beasley had made a defamatory remark about plaintiff. Id. at 7. This court found that "[t]he pertinent portions of Early's affidavit were not made on personal knowledge of the ultimate fact to be established, that Beasley published these [allegedly defamatory] statements * * * [.] Early's affidavit is based on hearsay and is thus inadmissible as evidence to support Lathwell's defamation claim." Id. Accordingly, this court affirmed the trial court's decision.Id. at 7-8.
In the present case, plaintiffs argue that their deposition testimony is not hearsay because the statements to which they testified were not offered to prove the truth of the matter asserted, namely that plaintiffs were having an affair; rather, the evidence was offered to show publication of the defamatory statement. See Evid.R. 801(C). Plaintiffs' assertion would be correct if Sense and Hardman had testified that Wears and Glenn had informed them the plaintiffs were having an affair. SeeTaylor v. Lenio (June 20, 1985), Cuyahoga App. No. 49300, unreported, 1985 Ohio App. Lexis 8095, at *7-8. The pertinent portions of Bennett and Merendino's depositions, however, were not made on personal knowledge of the ultimate fact to be established, specifically that Wears and Glenn published the defamatory statements. In fact, plaintiffs admitted that they never heard Wears or Glenn make any defamatory remarks. Thus, those portions of plaintiffs' depositions constitute inadmissible hearsay and cannot be used to defeat summary judgment. As plaintiffs did not produce any competent evidence showing publication, we conclude that the trial court properly granted summary judgment in favor of defendants on the defamation claim. Appellants' first assignment of error is overruled.
 B. Third Assignment of Error
The trial court erred in granting summary judgment on all ofPlaintiffs-Appellants' claims [i]n finding that the evidence of hostilework environment was not sufficient to support Merendino's claims of sexdiscrimination against Glenn and Roadway.
Merendino asserts that the trial court erred in entering summary judgment against her on her sex discrimination claim, as there was a genuine issue of material fact as to whether a hostile work environment existed. We disagree.
R.C. 4112.02(A) prohibits discrimination based on sex, stating:
It shall be an unlawful discriminatory practice [f]or any employer, because of the * * * sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.
"[A] plaintiff may establish a violation of R.C. 4112.02(A)'s prohibition of discrimination `because of * * * sex' by proving * * * `hostile environment' harassment, i.e., harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment." (First omission original.)Hampel v. Food Ingredients Specialties, Inc. (2000), 89 Ohio St.3d 169,176. The Ohio Supreme Court has held that
[i]n order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.
Id. at 176-77. "[H]arassing conduct that is simply abusive, with no sexual element, can support a claim for hostile-environment sexual harassment if it is directed at the plaintiff because of his or her sex."Id. at 180. Furthermore, "R.C. 4112.02(A) does not reach disparate treatment on account of personal animosity; no matter how severe or pervasive the conduct, harassment does not constitute a discriminatory practice under R.C. 4112.02(A) unless based on a prohibited classification." Id. at 184-85.
In the present case, Merendino claims that defendants treated her adversely based on her sex. In her deposition, Merendino testified that Glenn treated her like a "bimbo," "look[ed] her up and down," and stared at her legs. When asked whether she could recall any other specific instances of sexual harassment by Glenn, Merendino responded:
Same thing of looking me up and down, dismissing me, not giving my work any validity, you know, calling on Debbie [Wears], when I could have answered a question, not having any respect for that position, not giving me any credit, with all of my background in the legal field, that I would have had some semblance of what was going on and the ability to follow through and be responsible. I never got any of that from [Glenn], he just dismissed me from the beginning, dismissed.
Merendino also mentioned that during meetings, Glenn would defer to Bennett and that Glenn would override her during telephone calls. She attributed Glenn's lack of respect for her work to the fact that he thought that she "was just some bimbo sleeping with the boss [Bennett]" to get the job. She further testified that a couple of coworkers told her that Glenn accused her of having an affair with Bennett. Additionally, Merendino related that Glenn would assign her time-consuming, pointless (according to Merendino) tasks and that Glenn's hostile treatment of her caused her work to suffer. She stated that after she and Bennett complained about Glenn's behavior, Glenn's hostile treatment increased and her employment with Roadway was terminated.
Construing Merendino's testimony most strongly in her favor, the evidence demonstrates that Glenn continually hassled Merendino while she was employed by Roadway and lacked confidence in her work. She also felt harassed by the manner in which Glenn looked her up and down. Merendino, however, has failed to show that Glenn's treatment of her was based on sex. Specifically, the record fails to disclose any disparity in the way Glenn treated male and female employees. See id. at 184. In fact, Merendino admitted that Glenn relied on Wears, a female employee at Roadway, and often deferred to her, instead of depending on Merendino's knowledge and expertise. Accordingly, viewing the evidence in a light most favorable to Merendino, we conclude that reasonable minds could not find that Glenn and Roadway's alleged harassment of Merendino was based on sex. Appellants' third assignment of error is overruled.
 C. Fourth Assignment of Error
The trial court erred in granting summary judgment on all ofPlaintiffs-Appellants' claims [i]n concluding that as a matter of lawBennett failed to establish a prima facie case of handicap discriminationagainst Roadway and Glenn.
In his fourth assignment of error, Bennett claims that the trial court erred in granting summary judgment in favor of Roadway and Glenn on his handicap discrimination claim. Specifically, he asserts that a genuine issue of material fact existed as to whether Glenn and Roadway unlawfully discriminated against him because they regarded him as having a physical or mental impairment. We disagree.
R.C. 4112.02(A) prohibits discrimination based on disability.
To establish a prima facie case of handicap discrimination, the person seeking relief must demonstrate (1) that he or she was handicapped, (2) that an adverse employment action was taken by an employer, at least in part, because the individual was handicapped, and (3) that the person, though handicapped, can safely and substantially perform the essential functions of the job in question.
Columbus Civ. Serv. Comm. v. McGlone (1998), 82 Ohio St.3d 569,571. R.C. 4112.01(A)(13) defines "handicap" as:
a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; orbeing regarded as having a physical or mental impairment.
(Emphasis added.) An emotional or mental illness is one form of "mental impairment." R.C. 4112.01(A)(16)(a)(ii). Under certain circumstances, depression may constitute a handicap for the purposes of R.C. 4112.02(A). See Shaver v. Wolske Blue (2000), 138 Ohio App.3d 653, 666. However, "[a]bsent indications that one or more major life activities have been substantially limited, the experience of depression is insufficient to constitute a disability." Cooke v. SGS Tool Co. (Apr. 26, 2000), Summit App. No. 19675, unreported, at 11, citing Beauchamp v. CompuServe, Inc. (1998), 126 Ohio App.3d 17, 23.
In the present case, Bennett claims that Glenn and Roadway unlawfully discriminated against him because they regarded him as having a mental impairment. In support of his claim, Bennett pointed to evidence showing that Bennett took a leave of absence for medical reasons beginning on April 28, 1998. In response to Glenn and Roadway's FMLA notice, Bennett provided them with a physician's note, which stated that Bennett was under his care and would be absent until May 18, 1998. On May 13, 1998, defendants sent Bennett a letter indicating that Bennett was required to submit to a fitness-for-duty examination with a Roadway-approved psychiatrist before returning to work. Without obtaining such an examination, Bennett returned to work on May 18, 1998, but was not permitted to work until he submitted to the psychiatric examination. The next day, Bennett furnished Roadway and Glenn with a letter from his physician, stating in its entirety that "Mr. Bennett remains under my care. He is medically cleared to return to full duty at work as of [May 18, 1998]."
Glenn acknowledged receiving the letter from Bennett's physician, but emphasized that he needed "an evaluation by the company psychiatrist before determining [Bennett's] fitness to return to duty." Glenn, however, noted that he was restoring Bennett to payroll as of May 18, 1998. On May 22, 1998, Bennett retained counsel, who advised Glenn that he needed time to discuss the psychiatric evaluation with Bennett and that after their discussion, the attorney would respond to Glenn. Subsequently, on May 27, 1998, Glenn informed Bennett that his "appointment with [the company psychiatrist] remain[ed] scheduled for June 9[, 1998]" and that Bennett had until 5:00 p.m. to inform him whether Bennett intended to keep the scheduled appointment. Glenn reiterated that the purpose of the examination was to determine Bennett's fitness to "perform the essential functions of [his] job." Rather than stating whether Bennett would keep the appointment, Bennett's attorney contacted Glenn by fax and requested time to discuss the matter with his client. The following day, Glenn cancelled the appointment with the psychiatrist, and on May 29, 1998, terminated Bennett's employment at Roadway. Roadway and Glenn substantially agree with these facts.
Construing this evidence most strongly in Bennett's favor, the evidence shows that Glenn and Roadway knew that Bennett had taken a medical leave of absence for emotional or mental reasons and that he was being treated by a physician in that regard. Bennett's physician's letter, clearing him to return to work, did not disclose the precise nature and extent of Bennett's condition or the physician's qualifications to make such a determination. Accordingly, defendants required Bennett to submit to a psychiatric evaluation by a company-approved psychiatrist ostensibly in order to ascertain his ability to perform the functions of his position. Importantly, the Sixth Circuit has found that an employer's requirement that an employee submit to a psychiatric evaluation to determine whether the employee could continue to fulfill the essential functions of the position is not tantamount to a perception by the employer that the employee is disabled. Sullivan v. River Valley School Dist. (C.A.6, 1999), 197 F.3d 804, 810-11. For such a requirement to be valid, however, "there must be evidence sufficient for a reasonable person to doubt whether an employee is capable of performing the job, and that any examination is limited to determining an employee's ability to perform essential job functions." Id. at 813. Here, after a medical leave of absence approximately three weeks in duration, defendants required the examination to ascertain Bennett's ability to perform the essential functions of his job. It is important to note that Bennett's position as corporate counsel involved analyzing and synthesizing complex factual and legal issues into a cogent whole and then providing legal advice to the company and its employees. Thus, the fact that Roadway and Glenn required Bennett to submit to such an examination, without more, does not lead to the conclusion that defendants regarded him as disabled, within the meaning of R.C. 4112.02(A). See id. at 811. Consequently, in viewing the evidence most strongly in favor of Bennett, we hold that reasonable minds could not conclude that Roadway and Glenn unlawfully discriminated against Bennett because they regarded him as disabled. Appellants' fourth assignment of error is overruled.
 D. Second Assignment of Error
The trial court erred in granting summary judgment on all ofPlaintiffs-Appellants' claims [i]n finding that the evidence of Roadway'sand Glenn's conduct did not rise to [the] level of "extreme andoutrageous conduct" necessary to support a claim for intentionalinfliction of emotional distress.
In his second assignment of error, Bennett asserts that the trial court incorrectly determined that Roadway and Glenn's retaliatory actions did not constitute extreme and outrageous conduct, and therefore, erred in granting summary judgment in favor of defendants on his intentional infliction of emotional distress claim. We disagree.
To establish a claim for intentional infliction of emotional distress, a plaintiff must prove the following four elements:
1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community;" 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable [person] could be expected to endure it."
(Citations omitted.) Pyle v. Pyle (1983), 11 Ohio App.3d 31, 34; see, also, Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, syllabus.
Bennett claims that the evidence presented regarding Glenn's conduct toward Bennett when he attempted to return to work after his medical leave of absence was sufficient to withstand summary judgment as to Bennett's intentional infliction of emotional distress claim. We set forth the relevant facts in our discussion of appellants' fourth assignment of error. We find that in viewing the evidence in a light most favorable to Bennett, reasonable minds could not conclude that defendants' actions constituted extreme and outrageous conduct.
We, therefore, adduce that the trial court properly entered summary judgment in favor of Roadway and Glenn on Bennett's intentional infliction of emotional distress claim. Appellants' second assignment of error is overruled.
 E. Fifth Assignment of Error
The trial court erred in granting summary judgment on all ofPlaintiffs-Appellants' claims [i]n finding that Plaintiffs "failed" topresent a "prima-facie showing of retaliation" and "had they done so, therecord is replete with evidence to support Roadway had a `legitimate,non-discriminatory' reason for both terminations."
Bennett and Merendino aver that the trial court improperly granted summary judgment to Roadway and Glenn on their retaliation claim, under R.C. 4112.02(I). They argue that the trial court erred in finding that they failed to present a prima facie showing of retaliation and in finding that, had they made such a prima facie showing, the record was replete with evidence to support a legitimate, nondiscriminatory reason for both terminations. We disagree.
Pursuant to R.C. 4112.02(I), it is an unlawful discriminatory practice
[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.
This court has held that a person must prove the following elements to establish a prima facie case of retaliation under R.C. 4112.02(I): (1) plaintiff engaged in a protected activity, (2) plaintiff was the subject of adverse employment action, and (3) a causal link between the protected activity and the adverse action existed. Chandler v. Empire Chem., Inc.,Midwest Rubber Custom Mixing Div. (1994), 99 Ohio App.3d 396, 402. Once a plaintiff establishes a prima facie case of retaliation, the burden then shifts to the defendant "to articulate a legitimate reason for its action." Id. If that burden is met, the burden then shifts back to the plaintiff "to show that the articulated reason was merely a pretext." Id. "[A] reason cannot be proved to be `a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Center v. Hicks (1993), 509 U.S. 502,515, 125 L.Ed. 407, 422.
Assuming arguendo that plaintiffs established a prima facie case of retaliation, defendants have articulated legitimate business reasons for terminating Bennett and Merendino's employment at Roadway. Glenn stated that Merendino was terminated due to restructuring the law department, while Bennett was terminated due to performance. According to Glenn, Bennett did not inform him that he was willing to keep the appointment with the company-approved psychiatrist by the time required by Glenn. This failure by Bennett, inter alia, apparently precipitated Bennett's termination two days later. Significantly, insubordination is generally a legitimate and nondiscriminatory reason for adverse employment action. See Hood v. Diamond Products, Inc. (1996), 74 Ohio St.3d 298, 302. Glenn further testified that once he decided to terminate Bennett, he discharged Merendino because he did not feel that she had the experience or the talent for the new more demanding position, which was created after restructuring the law department. Instead, Glenn awarded Wears the new position because he was impressed by her abilities.
Upon careful review of the record and construing the evidence most strongly in favor of Bennett and Merendino, we conclude that reasonable minds could not find that defendants' justifications for plaintiffs' terminations were merely a pretext. Accordingly, the trial court properly granted summary judgment on the retaliation claims. Appellants' fifth assignment of error is overruled.
 F. Sixth Assignment of Error
The trial court erred in granting summary judgment on all ofPlaintiffs-Appellants' claims [i]n finding that Bennett and Merendinofailed to establish their Violation of Public Policy Claim as they failedto comply with the statutory requirements of the "whistle blower"statute.
In their sixth assignment of error, Bennett and Merendino claim that the trial court erred in concluding that they had failed to establish their violation of public policy claims because they had failed to establish their discrimination and retaliation claims under R.C. 4112.02. The gravamen of their argument is that they did, in fact, demonstrate a genuine issue of material fact as to their discrimination and retaliation claims under R.C. 4112.02. We disagree.
To establish a claim for tortious wrongful discharge in violation of public policy, four-elements must be satisfied:
"1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
2. That dismissing employees under circumstances like those involved inthe plaintiff's dismissal would jeopardize the public policy (thejeopardy element).
3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element)." (Emphasis sic.)
(Bolding added.) Painter v. Graley (1994), 70 Ohio St.3d 377, 384, fn. 8, quoting H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398-99 (reaffirmed in Kulch v. Structural Fibers, Inc. (1997), 78 Ohio St.3d 134,150-51).
As Bennett and Merendino have failed to establish their discrimination and retaliation claims, as discussed infra, they have not proved that their discharges jeopardize those policies; consequently, the trial court properly granted summary judgment on their wrongful discharge in violation of public policy claims. See Cochran v. Columbia Gas of Ohio, Inc. (2000), 138 Ohio App.3d 888, 895; Crosier v. Quikey Mfg. Co., Inc. (Feb. 28, 2001), Summit App. No. 19863, unreported, at 18. Appellants' sixth assignment of error is overruled.
 G. Seventh Assignment of Error
The trial court erred * * * [i]n granting summary judgment as Defendants'reasons for discharging Plaintiffs were pretextual.
In their seventh assignment of error, Bennett and Merendino assert that the trial court erred in determining that defendants' business reasons for discharging them were not a pretext for retaliatory discharge and handicap and sex discrimination.
In order to reach the issue of whether defendants had legitimate business reasons for discharging plaintiffs and whether these business reasons were pretextual, plaintiffs must first establish a prima facie case for each of these claims. See Hood, 74 Ohio St.3d at 302 (writing that "[o]nce the plaintiff establishes a prima facie case of handicap discrimination, the burden then shifts to the employer to set forth some legitimate, nondiscriminatory reason for the action taken" and if the employer establishes a nondiscriminatory reason, the employee then "must demonstrate that the employer's stated reason was a pretext for impermissible discrimination"); Omobien v. Ohio Civ. Rights Comm. (1993), 89 Ohio App.3d 100, 104 (applying burden shifting to sex discrimination and discrimination cases generally). As previously discussed, both Merendino and Bennett failed to establish a prima facie case for their claims of handicap and sex discrimination. Therefore, regarding these discrimination claims, the issue of whether defendants' alleged legitimate business reasons for discharging plaintiffs were pretextual has been rendered moot. See App.R. 12(A)(1)(c). Furthermore, we discussed these arguments in regard to his retaliatory discharge claim in our disposition of appellants' fifth assignment of error. Appellants' seventh assignment of error is overruled in part and rendered moot in part.
 OTHER ISSUES H. Eighth Assignment of Error
The trial court further erred in [d]enying Plaintiff Bennett's Motion forLeave to Amend the Complaint to include Bennett's claim against Roadwayfor tortious interference with his employment contract with StarkCounty.
In his eighth assignment of error, Bennett asserts that the trial court abused its discretion in denying his motion for leave to amend the complaint, pursuant to Civ.R. 15, to include his claim against Roadway for tortious interference with his employment contract with Stark County. This claim is based upon Bennett's allegation that "[c]ounsel for Roadway has provided information to Bennett's current employer, Stark County, Ohio, to support a hearing to discharge Bennett in which Stark County alleges that Bennett falsified his application for employment as the Stark County Labor [sic] Director." He also argues that Civ.R. 18(A) permits him to join his claim for tortious interference with his employment contract. We disagree.
Civ.R. 18(A) provides for the liberal joinder of claims, stating "[a] party asserting a claim to relief as an original claim, counterclaim, cross-claim, or third-party claim, may join, either as independent or as alternate claims, as many claims, legal or equitable, as he has against an opposing party." Civ.R. 18(A), however, does not set forth the appropriate procedure for bringing additional claims after the initial complaint has been filed. For this reason, Mr. Bennett's reliance onDouglas v. Cincinnati Bd. of Edn. (1992), 80 Ohio App.3d 173, is misplaced. In Douglas, the plaintiff brought multiple claims against the defendant in his original complaint. Id. at 178-79. The trial court, however, refused to allow the plaintiff to present evidence on one of his claims (his tort claim), which had been raised in the initial complaint. The First District Court of Appeals determined that "the trial court erred in prohibiting Douglas from going forward on his tort claim" because Civ.R. 18(A) provides for the liberal joinder of claims in original actions and because barring his tort claim would preclude any redress for other injuries the defendant may have caused regarding this matter. Id. at 179.
Unlike the plaintiff in Douglas, Mr. Bennett sought to assert an additional claim, which was not raised in the initial complaint because the events allegedly giving rise to the claim occurred over a year and a half after the initial complaint was filed. Civ.R. 15 governs amended and supplemental pleadings. Civ.R. 15(A) provides that, after the period for automatic amendment has expired, a trial court shall freely grant leave to amend the complaint "when justice so requires." On the other hand, Civ.R. 15(E) states, in part, that "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."
This court has explained that "[a]n amended pleading [pursuant to Civ.R. 15(A)] is designed to include matters occurring before the filing of the complaint but either overlooked or not known at the time," while "[a] supplemental pleading [pursuant to Civ.R. 15(E)] * * * is designed to cover matters subsequently occurring but pertaining to the original cause." Mork v. Waltco Truck Equip. Co. (1990), 70 Ohio App.3d 458, 461. "Moreover, the staff notes to Civ.R. 15(E) provide that `fundamentally, a supplemental pleading is a mere addition to, or continuation of, the original complaint.'" Id. Therefore, "[u]nder Civ.R. 15, a supplemental pleading must contain only matter[s] in common with the original complaint" and may not raise "[a] new and different cause of action[.]"Id.
A trial court's decision whether to grant leave to file a supplemental pleading will not be disturbed on appeal absent an abuse of discretion. See Civ.R. 15(E); Mork, 70 Ohio App.3d at 461. An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. OhioState Med. Bd. (1993), 66 Ohio St.3d 619, 621. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Id.
In the present case, although Mr. Bennett filed a motion to amend his complaint, we note that the motion was more appropriately termed a supplemental pleading under Civ.R. 15(E), as the events giving rise to the tortious interference with employment contract claim occurred subsequent to the matters in the original complaint. See Mork,70 Ohio App.3d at 461. Apparently, the events giving rise to the cause of action occurred in July 2000, over a year and a half after the initial complaint was filed, when Roadway provided Bennett's then current employer, Stark County, Ohio, with information regarding Bennett's termination from Roadway to support a hearing to discharge Bennett from his employment with Stark County, Ohio. Bennett moved for leave to add this claim after discovery had been completed and after defendants had filed their motions for summary judgment. Furthermore, Bennett's supplemental pleading is more than a mere addition to, or continuation of, the original complaint and sets forth a new and different cause of action. See Mork,70 Ohio App.3d at 461. Hence, we cannot say that, under these circumstances, the trial court abused its discretion in denying Bennett's motion to file an additional claim for tortious interference with his employment contract with Stark County. In addition, Bennett is not prevented from seeking redress for this cause of action, as he may file this claim in a separate complaint. The eighth assignment of error is overruled.
 I. Ninth Assignment of Error
The trial court further erred in [d]enying Plaintiffs' Motion toCompel Nancy Sense to answer questions on deposition.
In their ninth assignment of error, appellants contend that the trial court erred in denying their motion to compel Nancy Sense, a secretary for Roadway, to disclose the content of her communications with Glenn and Roadway's attorney, which were made in preparation for her deposition. Specifically, appellants assert that the trial court incorrectly determined that these communications were covered by the corporate attorney-client privilege. We disagree.
A trial court has broad discretion in ruling on a motion to compel discovery. State ex rel. The V Cos. v. Marshall (1998), 81 Ohio St.3d 467,469. Therefore, in the absence of an abuse of discretion, an appellate court will not overturn the trial court's ruling on discovery matters. See id. An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons, 66 Ohio St.3d at 621. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Id.
Civ.R. 26(B) provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action[.]" (Emphasis added.) Generally, communications between an attorney and his or her client are privileged. See R.C. 2317.02(A). The term "client," as used in R.C. 2317.02(A), includes:
a person, firm, partnership, corporation, or other association that, directly or through any representative, consults an attorney for the purpose of retaining the attorney or securing legal service or advice from him in his professional capacity, or consults an attorney employee for legal service or advice, and who communicates, either directly or through an agent, employee, or other representative, with such attorney[.]
R.C. 2317.021.
In Upjohn Co. v. United States (1981), 449 U.S. 383, 66 L.Ed.2d 584, the United States Supreme Court addressed the attorney-client privilege as it applies to a corporate client. The court found that the attorney-client privilege extended to communications made by employees of a corporate client to a corporation's counsel under certain circumstances. Id. at 390, 66 L.Ed.2d at 591. In determining that the privilege applied in Upjohn, the United States Supreme Court focused on the fact that the communications were made by the employees to corporate counsel, who was acting as such, at the direction of corporate supervisors in order to secure legal advice. Id. at 394,66 L.Ed.2d at 594. The court further considered that "[t]he communications concerned matters within the scope of the employees' corporate duties, and the employees themselves were sufficiently aware that they were being questioned in order that the corporation could obtain legal advice." Id. While relying on these factors in determining whether the privilege applied in Upjohn, the court admonished that the application of the corporate attorney-client privilege must be determined on a "`case-by-case'" basis. Id. at 396, 66 L.Ed.2d at 596.
In addition, Upjohn rejected the proposition that the privilege only applied to high level employees or "control group" and found that the attorney-client privilege in the corporate context applied to all employees regardless of "level[.]" Id. at 391, 66 L.Ed.2d at 592. Furthermore, it is important to note that "[t]he privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney[.]" Id. at 395, 66 L.Ed.2d at 595.
In the present case, Bennett and Merendino sought to discover the content of Sense's communications with Glenn and Roadway's attorney, which were made in preparation for her deposition. It is undisputed that Sense was an employee (a secretary) with Roadway, both at the time the deposition was taken and when plaintiffs' employment with Roadway was terminated. As previously mentioned, Upjohn applied the attorney-client privilege in the corporate context to all employees regardless of "level[.]" Id. at 391, 66 L.Ed.2d at 592. Furthermore, Sense's communications with Roadway and Glenn's attorney were made in preparation for her deposition, which was scheduled for the following day. This pre-deposition meeting was held "[i]n the office." Significantly, Sense did not refuse to answer plaintiffs' questions concerning the underlying facts. See id. at 395, 66 L.Ed.2d at 595. In fact, Sense denied that Wears told her that Bennett was having an affair or romantic relationship with Merendino. Accordingly, we cannot conclude that the trial court abused its discretion in finding that the communications were protected under the corporate attorney-client privilege, and therefore, in denying appellants' motion to compel. Appellants' ninth assignment of error is overruled.
 III.
Appellants' first through sixth, eighth, and ninth assignments of error are overruled. Their seventh assignment of error is overruled in part and rendered moot in part. The judgment of the Summit County Court of Common Pleas is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellants.
Exceptions.
 ____________________________ WILLIAM G. BATCHELDER
SLABY, J., WHITMORE, J. CONCUR.